GARRARD v. SILVER PEAK MINES et al.

(Circuit Court of Appeals, Ninth Circuit. May 8, 1899.)

No. 439.

1. PUBLIC LANDS—MINERAL CHARACTER—SALINE LANDS.
    Saline lands are mineral, within the meaning of a provision of an act of congress reserving mineral lands from a grant.

2. SAME—GRANT TO STATE—EFFECT OF RESERVATION OF MINERAL LANDS.
    By Act Cong. June 16, 1880 (21 Stat. 287), congress granted to the state of Nevada 2,000,000 acres of land, to be selected by the state from "unappropriated, nonmineral, public lands." By an act of the state legislature of March 3, 1887 (St. 1887, p. 102), the state expressly disclaimed on behalf of itself and its grantees any rights in any mineral lands which had been or might be selected under such grant, and further provided that its conveyances should give no rights as against persons in actual adverse possession. Held, that the state acquired no rights in land selected under the grant which was in fact known mineral land, containing both salt and the precious metals, which had been appropriated in 1865 under an act for the location of land containing salt, surveyed, and the location recorded, and which had ever since been in the actual possession of the locator and his grantees, who had erected a quartz mill thereon at a cost of over $50,000, and that a patent executed by the state therefor to an applicant to purchase who had actual knowledge of all such facts was void.

3. SAME—PATENTS BY STATE—COLLATERAL ATTACK.
    Such patent, being without authority of law, and prohibited by the law of the state which issued it, is subject to collateral attack in an action at law.

In Error to the Circuit Court of the United States for the District of Nevada.

Reddy, Campbell & Metson, for plaintiff in error.
M. A. Murphy, for defendant in error.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

ROSS, Circuit Judge. This was an action of ejectment, in which the defendants prevailed in the court below. 82 Fed. 578. The plaintiff has brought the case here by writ of error. The subject of the action is a certain 40-acre tract of land situate in Esmeralda county, Nev., described in the complaint as the N. E. ¼ of the N. E. ¼ of section 22, township 2 S., range 39 E., Mt. Diablo base and meridian, together with a lot of mill tailings and slimes containing gold and silver, which the plaintiff in his complaint alleges was upon

the land, and was removed therefrom and converted by the defendants to the plaintiff's damage. The plaintiff's claim to the land has its foundation in the act of congress approved June 16, 1880 (21 Stat. 287), and in certain legislation of the state of Nevada passed pursuant thereto. By the act of June 16, 1880, congress granted to the state of Nevada 2,000,000 acres of land, which lands, the act declared, were to be selected by the state authorities from "unappropriated, nonmineral, public lands," and "in quantities not less than the smallest legal subdivision." On the 12th day of March, 1885, the legislature of the state of Nevada passed an act entitled "An act to provide for the selection and sale of lands that have been or may hereafter be granted by the United States to the state of Nevada," by which act a state land office was created, of which the surveyor general of the state was made ex officio land register, and to whom all applications to purchase such lands as congress had granted or should grant to the state were required to be made. The act prescribes the course of proceedings in the matter of such applications, and provides that "all lands selected under the two million acre grant of June sixteenth, eighteen hundred and eighty, may be sold in tracts equal to one section to each applicant," and that "no lands shall be sold in tracts less than the smallest legal subdivision." St. 1885, p. 101. Under and pursuant to the provisions of this state legislation, one Alexander Morrison made application to the land register of the state of Nevada for the 40-acre tract in question, making the required payments therefor in the prescribed way, and the land register thereupon selected and made application therefor to the land department of the United States under and by virtue of the act of congress of June 16, 1880. The list of selected land under that grant, including the piece in controversy, was certified by the commissioner of the general land office on the 7th of August, 1890, and by the acting secretary of the interior on the next day, "subject to any valid interfering rights which may have existed at the date of the selection." The act of congress making the grant to the state of Nevada does not provide for the issuance of a patent to the state for the lands thereby granted. But by an act of congress of August 3, 1854 (10 Stat. 346), and embodied in the Revised Statutes as section 2449, it is declared:

"That in all cases where lands have been or shall hereafter be granted by any law of congress to any one of the several states and territories; and where said law does not convey the fee simple title of such lands or require patents to be issued therefor; the lists of such lands which have been or may hereafter be certified by the commissioner of the general land office under the seal of such office, either as originals or copies of the originals or records, shall be regarded as conveying the fee simple of all the lands embraced in such lists that are of the character contemplated by such act of congress and intended to be granted thereby; but where lands embraced in such lists are not of the character embraced by such acts of congress, and are not intended to be granted thereby, the lists, so far as these lands are concerned, shall be perfectly null and void, and no right, title, claim, or interest shall be conveyed thereby."

The supreme court has decided in a number of cases that a certified list issued under and pursuant to this statute is of the same effect as a patent. Frasher v. O'Connor, 115 U. S. 102, 5 Sup. Ct. 1141;

Mower v. Fletcher, 116 U. S. 380, 6 Sup. Ct. 409; McCreery v. Haskell, 119 U. S. 327, 7 Sup. Ct. 176; Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. 985; Chandler v. Mining Co., 149 U. S. 79, 13 Sup. Ct. 798. The certified list, therefore, embracing the 40-acre tract in question, is to be regarded as a patent from the United States to the state of Nevada,—made, however, as is expressly recited on its face, "subject to any valid interfering rights which may have existed at the date of selection." Based upon that conveyance to it, the state of Nevada on the 22d day of May, 1891, by its proper officers, executed to Alexander Morrison its patent for the 40-acre tract in controversy, which patent recites upon its face that it is executed "according to the provisions of an act of the legislature approved March 12, 1885, entitled 'An act to provide for the selection and sale of lands that have been or may hereafter be granted by the United States to the state of Nevada,' and the act amendatory thereof and supplemental thereto." The supplementary act of the state of Nevada is that of March 5, 1887 (St. 1887, p. 124), entitled "An act defining the rights of applicants for and contractors to purchase land from the state of Nevada, and providing for maintaining certain actions concerning such land," by the first section of which it is declared that:

"Every person who has applied to the state of Nevada to purchase any land from it, or who has contracted with the state of Nevada for such purchase, or who may hereafter apply to or contract with the state of Nevada, in good faith, for the purchase of any of its public land, and who has paid or shall pay to the proper state officers the amount of money requisite under such application or contract, shall be deemed and held to have the right to the exclusive possession of the land described in such application or contract: provided, no actual adverse possession thereof existed in another at the date of the application."

The second section of the act excludes, from the right thereby given to every one who has applied or contracted to purchase from the state any such land the right to maintain or defend any action at law or in equity concerning it or its possession, all such land that was in the adverse possession of another at the date of such application to purchase.

Shortly after Morrison received his patent for the 40-acre tract in controversy, to wit, June 29, 1891, he executed a deed therefor to the plaintiff, Garrard.

The answer of the defendant corporation, the Silver Peak Mines, in addition to denying the plaintiff's alleged ownership of the property and his alleged right to its possession, alleges as a defense to the action that in the year 1865, or thereabouts, the predecessors in interest and grantors of the defendant corporation, under and by virtue of an act of the legislature of the state of Nevada entitled "An act to provide for the location of lands containing salt," located and had surveyed a tract of land and mill site and water right in the Silver Peak and Red Mountain mining district of Esmeralda county, Nev., containing 160 acres, specifically described in the answer; that such tract was located upon the unsurveyed and unappropriated public domain of the United States; that in the years 1865, 1866, and 1867, or thereabouts, the grantors and predecessors in interest of the defendant corporation caused to be erected and con-

structed on the 160-acre tract a quartz mill costing about $70,000; that after the completion of the mill such proceedings were had and taken as that the government of the United States on the 1st day of May, 1879, pursuant to law, issued to the grantors and predecessors in interest of the defendant corporation a patent for 4.97 acres of the land upon which the quartz mill was then constructed, as a mill site; that ever since the year 1865 the defendant corporation and those from whom it has derived its title have been in the quiet, peaceable, and undisturbed possession of the said 160-acre tract of land, including the patented mill site; that ever since the year 1865 the defendant corporation, through its predecessors in interest and grantors, "has been, and now is, a bona fide settler and occupant of the land and premises described in the plaintiff's complaint on file herein, and the whole thereof"; that the defendant corporation and its grantors have made valuable improvements thereon; that such settlement and improvements were made long prior to any selection of the 40-acre tract by the plaintiff or his grantor, and that the plaintiff and his grantor were well aware at the date of the selection under which the plaintiff claims that the defendant corporation and its grantors "was, and had been for a great number of years, in the open, notorious, and exclusive possession of all of said land, claiming ownership of and to the same as against this plaintiff, his grantors, and the entire world"; that on the 19th day of June, 1888, or thereabouts, and prior to the selection under which the plaintiff claims, one D. M. Brunton discovered, located, and claimed a quartz ledge, under the name of the "Mancer Mining Claim," 1,500 feet in length by 600 feet in width, containing gold, silver, and other precious metals, in and upon the 40-acre tract described in the plaintiff's complaint; and that the said Brunton thereafter, for a valuable consideration, conveyed to the defendant corporation all his right, title, and interest in and to the said ledge, and in and to his said mining claim thereon located, ever since which time the defendant corporation has been in the quiet, peaceable, and undisturbed possession thereof. The answer further alleges that notwithstanding that the plaintiff and his grantor well knew that the defendant corporation was, and had been for a long time prior to the date of the application by Morrison to purchase the 40-acre tract described in the complaint, in the quiet, peaceable, and undisturbed occupancy of the said land, and every part thereof, and well knowing that the defendant corporation and its grantors and predecessors in interest had caused to be erected thereon valuable, prominent, and permanent improvements, at a cost of about $100,000, and well knowing that the said land was mineral in character, containing gold, silver, and other precious metals, and also salt and saline, and that the said land was not fit for grazing or agricultural purposes, they, and each of them, falsely and fraudulently misrepresented and misstated the facts to the surveyor general and ex officio land register of the state of Nevada, and by such false and fraudulent acts and misrepresentations induced that officer to believe that the said land was unoccupied land, and nonmineral in character, and that he, so believing the said statements of the plaintiff and his

grantor, was induced to select the 40-acre tract described in the complaint as a part of the lands granted to the state of Nevada by the act of congress referred to, when in truth and in fact the said land was not of the class of lands thereby granted, but, on the contrary, was expressly excluded therefrom.

The case, by stipulation of the respective parties, was tried by the court below without a jury, after which the court made, among others, the following findings of fact:

"Third. That none of the land described in the plaintiff's complaint is suitable or fit for agricultural or grazing purposes, but is mineral; the greater portion of it being covered with salines, and a quartz vein, lead, or lode being located and situate thereon. Fourth. That, at the time the grantor of this plaintiff made his application to purchase the land described in the plaintiff's complaint from the state of Nevada, he will [well] knew, and at the date when this plaintiff accepted the deed of the said land this plaintiff well knew, that the said land was appropriated, occupied, and not public land, and in the adverse possession of this defendant. Fifth. That neither the plaintiff nor his grantor, Alexander Morrison, was ever in the possession of the land described in the plaintiff's complaint, or any part thereof." "Seventh. That in the year 1865 the grantors and predecessors in interest of this defendant, Silver Peak Mines, constructed a ten-stamp quartz mill on the unsurveyed and unoccupied public lands of the United States and called it the 'Great Salt Basin Gold & Silver Mining Company's Quartz Mill.' They also located, under the possessory act of the state of Nevada, entitled 'An act to provide for the location of lands containing salt,' approved February 24, 1865, one hundred and sixty acres of land containing salt and other salines. That on the 18th day of November, 1865, they had the said land surveyed by the county surveyor of Esmeralda county, and the boundaries thereof marked by posts and mounds; and on the 18th day of December, 1865, the field notes of said survey were certified to as being correct by the said county surveyor, and on the 20th day of January, 1866, said field notes, together with a diagram of said location and survey, were recorded in the office of the county recorder of Esmeralda county, state of Nevada. That in the spring of 1866 they dug a ditch on three sides of the tract of land so located, surveyed, marked, platted, and recorded, and upon which the aforementioned quartz mill had been constructed; and the forty-acre tract of land, as now claimed by this plaintiff, is situated within the boundaries of said possessory location and survey. That in the fall of the year 1866 the grantors of this defendant, Silver Peak Mines, graded the foundation for a new quartz mill, and during the years 1866, 1867, and 1868 constructed and completed a thirty-stamp quartz mill on the land embraced within their possessory location and survey, and on the land as now claimed by this plaintiff; said mill and improvements costing upwards of fifty thousand dollars. That on the 7th day of November, A. D. 1866, Samuel B. Martin and John W. Harker, being then in the possession of the said lands, and the owners of all the improvements thereon, did, by a good and sufficient deed of conveyance, transfer, sell, and assign all their right, title, and interest in and to the said lands, and every part thereof, together with the improvements thereon, to Silver Peak & Red Mountain Gold & Silver Mining Company, a corporation, which said corporation entered into possession of said land, and every part thereof, and the improvements thereon. That thereafter the said Silver Peak & Red Mountain Gold & Silver Mining Company had a survey made of four and ninety-seven hundredths acres of land for a mill site, upon which the said mill was then constructed, and in the year 1879 the government of the United States, through its land department, issued to this defendant, Silver Peak Mines, as the successor in interest of the said Silver Peak & Red Mountain Gold & Silver Mining Company, a patent for the four and ninety-seven hundredths acres of land upon which the said mill had been constructed, and the said land so patented is within the boundaries of the land now claimed by this plaintiff. That on the 19th day of June, 1888, one D. W. Brunton discovered and located a quartz ledge containing gold, silver, and copper, and other precious metals, in and upon the lands now claimed by this plaintiff, as described in his complaint.

That on the 1st day of June, 1889, the said D. W. Brunton, for a valuable consideration, deeded all his right, title, and interest in and to the said mining claim, and every part thereof, to this defendant, Silver Peak Mines, who has been ever since said date, and now is, the owner and in the quiet and undisturbed possession of the said mining claim, and every part thereof. That on the 5th day of April, 1877, the said Silver Peak & Red Mountain Gold & Silver Mining Company became a bankrupt, and proceedings in bankruptcy were instituted in the United States district court, Southern district of New York, in which state said corporation was organized; and Andrew C. Armstrong was duly appointed, qualified, and acted as the assignee of the bankrupt's estate. That Armstrong, as such assignee, on the 13th day of June, A. D. 1877, conveyed all the property of the said Silver Peak & Red Mountain Gold & Silver Mining Company, including the land in controversy in this action, to Charles E. Vail, who, with his wife, conveyed the said property, including the land in controversy, to the defendant Silver Peak Mines, herein, on the 8th day of January, 1878. That the property of the bankrupt corporation, including the land in controversy in this action, was also sold at sheriff's sale, under an execution issued out of the district court of the Eighth judicial district, state of Nevada, in and for the county of Esmeralda, in a suit wherein one John I. Blair was the plaintiff and the Silver Peak & Red Mountain Gold & Silver Mining Company was the defendant, at which sale John D. Vail was the purchaser; and on the 5th day of February, A. D. 1878, the said sheriff of Esmeralda county made, executed, and delivered to the said John D. Vail a deed to the property so sold under execution, including the land in controversy. That thereafter, to wit, on the 13th day of September, 1879, the said John D. Vail and his wife conveyed the same by deed to this defendant, Silver Peak Mines. That this defendant has been since last-mentioned date, and now is, in the actual, quiet, peaceable, and undisturbed possession of all of said lands; and it and those through whom it claims and derives title have been in the actual, quiet, peaceable, and undisturbed possession of all of the said land described in the plaintiff's complaint ever since the year 1865, and have caused to be constructed on said land and premises prominent and permanent improvements at an expense of over fifty thousand dollars."

These findings are assailed as being unsupported by the evidence. We think, as did the court below, that it is unnecessary to inquire into the validity of the mesne conveyances under which the defendant corporation asserts title. The action being ejectment, the plaintiff must recover, if at all, upon the strength of his own title. A careful examination and consideration of the record makes it clear that the trial court was entirely justified in finding that the land in question is not only mineral in character, and was so known to be by the plaintiff and his grantor at the time, and long prior to the time, when the latter made application to purchase it from the state of Nevada, but also in finding that it was then in the actual and adverse possession of the defendant corporation, or those under whom it claims, and had been so possessed under the claim of right for mining purposes by the Silver Peak Mines and those under whom it claimed ever since the year 1865. For part of the 40-acre tract claimed by the plaintiff as agricultural land the United States issued its certificate of purchase to the Silver Peak & Red Mountain Gold & Silver Mining Company, under the mining mill site act of congress (Rev. St. tit. 32, c. 6), on the 1st day of May, 1879, which was prior to the making by congress of the grant to the state of Nevada under which the plaintiff claims, and on which mill site there had already been erected, and then stood, a quartz mill costing many thousand dollars. Not only so, but the whole of the 40-acre tract

described in the plaintiff's patent is included within the 160-acre tract located by the Great Salt Basin Gold & Silver Mining Company in 1865 under and by virtue of a statute of the state of Nevada entitled "An act to provide for the location of lands containing salt," approved February 24, 1865 (Gen. St. 1885, p. 104), a survey of which was made on the 8th day of November of that year, and recorded in the recorder's office of the county in which the land is situated. That saline lands are mineral is well settled. Morton v. Nebraska, 21 Wall. 660; Milling Co. v. Clay (Ariz.) 29 Pac. 9. Moreover, in and upon this particular 40-acre tract so applied for by the plaintiff's grantor, and patented to him, was the ledge of quartz discovered, located, and claimed by Brunton, whose interest therein was afterwards conveyed to the defendant corporation. That such land as this, whose true character at the time of and prior to the initiation of the proceedings under which the plaintiff claims was disclosed, not only by the public records, but by costly mining structures and improvements erected thereon, of which the plaintiff, as shown by the evidence and findings, had not only constructive but actual knowledge long prior to the making of the application under which he claims, did not pass under the grant to the state of Nevada, and the patent issued by it to the grantor of the plaintiff, is, we think, very clear.

The list certified by the officers of the land department of the United States to the state of Nevada, and which serves as its patent, in terms declares that it is made "subject to any valid interfering rights which may have existed at the date" of the selection of the land by the state. The grant by congress was made in express terms to apply only to "unappropriated, nonmineral, public lands." The grantee, by act of its legislature of March 3, 1887 (St. 1887, p. 102), in terms declared and recognized the fact that the several grants made by the United States to the state of Nevada reserved the mineral lands, and expressly declared that the sales of such lands made by the state were made subject to such reservation. The statute of Nevada further provided that:

"Any citizen of the United States, or person having declared his intention to become such, may enter upon any mineral lands in this state, notwithstanding the state's selection, and explore for gold, silver, copper, lead, cinnabar, or other valuable mineral, and upon the discovery of such valuable mineral may work and mine the same in pursuance of the local rules and regulations of the miners and the laws of the United States: 'provided, that after a person who has purchased land from the state has made valuable improvements thereon, such improvements shall not be taken or injured without full compensation. But such improvement may be condemned for the uses and purposes of mining in like manner as private property is by law condemned and taken for public use,"—the act declaring, in terms, that "mining for gold, silver, copper, lead, cinnabar and other valuable mineral, is the paramount interest of this state."

Section 2 of the same act declares that:

"Every contract, patent or deed hereafter made by this state, or the authorized agents thereof, shall contain a provision expressly reserving all mines of gold, silver, copper, lead, cinnabar, and other valuable minerals that may exist in such land, and the state for itself and its grantees, hereby disclaims any interest in mineral lands heretofore or hereafter selected by the state on account

of any grant from the United State's. All persons desiring titles to mines upon lands which have been selected by the state, must obtain such title from the United States under the laws of congress, notwithstanding such selection."

The facts shown by the record make it clear that the patent under which the plaintiff claimed was not only not authorized, but was prohibited, by the statutes of the very state whose patent it purports to be—First, because it was issued for known mineral land; and, next, because the land for which it was issued then was, and for many years prior to the application therefor had been, in the actual occupation of another under a claim of right. That a patent issued without authority of law may be impeached collaterally in a court of law is thoroughly settled. Patterson v. Winn, 11 Wheat. 380; Smelting Co. v. Kemp, 104 U. S. 636; Wright v. Roseberry, 121 U. S. 488, 7 Sup. Ct. 985; Doolan v. Carr, 125 U. S. 618, 8 Sup. Ct. 1228; Davis' Adm'r v. Weibbold, 139 U. S. 507, 11 Sup. Ct. 628; Knight v. Association, 142 U. S. 161, 12 Sup. Ct. 258. The judgment is affirmed.