TEXAS PACIFIC COAL & OIL CO., Respondent, v STATE,
ET AL., APPELLANTS.
WILLIAMS, ET AL., INTERVENORS, v STATE, ET AL.,
APPELLANTS.
No. 8982.
Submitted May 14, 1951. Decided July 24, 1951.
234 Pac. (2d) 452.

Mr. Arnold H. Olsen, Atty. Gen., Mr. Patrick J. Gilfeather,
Sp. Asst. Atty. Gen., Mr. Charles V. Huppe, Asst. Atty. Gen.,
for appellant.

Messrs. Toomey, McFarland and Wagner, and Mr. Edmond G.
Toomey, all of Helena, Mr. Eugene T. Adair, Fort Worth, Texas,
for plaintiff and respondent.

Mr. Ralph J. Anderson, Mr. James E. Murphy, Kalispell, for
intervenors.

Mr. Ralph J. Anderson, Helena, amicus curiae.

Mr. Olsen, Mr. Gilfeather, Mr. Huppe, Mr. Toomey, Mr. Adair
and Mr. Anderson argued orally.

THE HONORABLE W. W. LESSLEY, District Judge (sit-
ting in place of MR. JUSTICE BOTTOMLY, disqualified).

Texas Pacific Coal and Oil Company, a corporation, plaintiff, brought this suit in equity in the district court of Toole county, against the state of Montana, its board of land commissioners, and others, defendants, seeking an injunction and to quiet plaintiff's leasehold title to oil and gas deposits under some 560 acres of school land located in section 36, township 35 north, range 2 west, in Toole county, and acquired by the state from the United States of America under the state's Enabling Act. The trial before the court sitting without a jury resulted in findings of fact, conclusions of law and decree for plaintiff, from which decree the defendants have appealed.

Defendants assign as error the making of certain of the findings and conclusions and the rendering of the decree for plaintiff.

On March 17, 1925, plaintiff's predecessor in interest obtained a five-year oil and gas lease on the lands with preference privilege and option of renewing the lease for an additional term, not exceeding five years from the expiration date of the lease upon the same terms and conditions as to rental and royalties and other requirements as the original lease.

In the early part of the year 1945 the defendant state land board declined to issue to plaintiff a fourth five-year renewal of the oil and gas lease, and on February 19, 1945, plaintiff instituted this suit seeking, *inter alia,* to preserve what it refers to as the right of renewal of its lease and to secure for itself the interim production of gas and oil subsequent to the commencement of the suit subject to the rights of the state under the terms of the lease.

The decree adjudged: That plaintiff was the owner of a valid outstanding lease from the state covering the oil and gas interest in the land; that plaintiff was entitled to renewals of the lease for successive five-year periods if application for renewal, payment and proof of compliance with the conditions of renewal were made evident; that plaintiff's title to the lessee's share of the oil and gas produced in the lands be quieted subject to the state's royalty and the over-riding royalty in favor of the Kalispell-Kevin Oil Company; and that defendant

be enjoined from leasing the leasehold estate to others or from advertising same for re-leasing.

The trial court's finding of fact No. 50 recites: "That there is no substantial disputed question of fact in this action." None of the parties excepted to such finding. Accordingly the facts herein stand undisputed.

The exhaustive record before us presents this question: Is there a limitation on the term of the lease here involved?

While the precise question has not heretofore been passed upon by this court, its answer is to be found in the provisions of the Enabling Act, particularly sections 10, 11, 18 and 19 thereof, the Constitution of Montana and the statutes of the state.

Section 10 of the Enabling Act sets out the land grants to the state for the support of its common schools. It is without doubt a general granting clause and shows clearly the interest of the Congress in the common schools of the newly admitted state.

Section 11 is broad. It speaks of "all lands herein granted". ■ It will take devious reasoning to rob that phrase of its true meaning. Lands as a word in the law includes minerals and minerals includes oil and gas.

In Gas Products Co. v. Rankin, 63 Mont. 372, 389, 393, 207 ■ Pac. 993, 997, 24 A. L. R. 294, this court said:

"The common-law rule is stated thus by Blackstone:

" 'Land hath also, in its legal signification, an indefinite extent, upwards as well as downwards. * * *'

"* * * The general rule is that —

" 'Both petroleum and gas, as long as they remain in the ground, are a part of the realty. * * *' "

In Campbell v. Flying V Cattle Co., 25 Ariz. 577, 220 Pac. 417, at page 419, it is said:

"* * * the word 'land,' when used in its broad sense, as in this instance, 'includes,' according to the court in L[ouisville] & N. R. Co. v. Boykin, 76 Ala. 560, 'not only the surface of the earth, but the mines, quarries, and everything under it, and

whoever has the fee in the surface presumptively owns everything of a permanent nature, under or over it.' * * *

"* * * A reservation in the vendor of a part of the estate would be so contrary to the meaning ordinarily conveyed when the sale of lands is spoken of that it must be assumed the Legislature, in providing that certain state lands are subject to sale, used the words 'lands' and 'sale' in their commonly accepted sense, and that if it had intended they should have a different meaning—that is, have authorized the sale of less than the fee—it would have said so in clear and unmistakable language.''

It is consonant with clear construction to accept the simple and obvious when it is so evident.

The first sentence of section 18 reads: ''That all mineral lands shall be exempted from the grants made by this act.'' This language must be weighed in context. It must be understood in reference to section 14 of the Organic Act, stating the intent of Congress to grant to the Territory of Montana sections 16 and 36 for benefit of the common schools. The same desire to aid the common school fund found in section 10 of the Enabling Act must be considered. But even more helpful to see and understand the meaning and application of that sentence is the remaining language of the section, viz.: ''*But* if sections sixteen and thirty-six, or any subdivision or portion of any smallest subdivision thereof in any township *shall be found* by the department of the interior to be mineral lands, said states are hereby authorized and empowered to select, in legal subdivisions, an equal quantity of other unappropriated lands in said states, *in lieu thereof,* for the use and benefit of the common schools of said states.'' Emphasis supplied.

The ''lieu thereof'' thought and language is a legible signpost to understanding. Clearly, as soon as survey identified the land and it was not *then* mineral it went to the state for the common school fund. The land passed and with it the after discovered mineral. If the mineral character was known at the time then title remained in the United States and the ''lieu thereof'' language operated. Simply, section 18 applied to lands

known to be mineral at time of survey and clear listing. See 36 Am. Jur., Mines & Minerals, sec. 16, pp. 292, 293. The condition of the exemptive language of section 18 so heavily relied upon by plaintiff and the trial court is knowledge of mineral character between date of grant and the clear listing.

The acceptance of the grant does not militate against this view of section 18. It is true that the acceptance of the grant does not mention mineral and equally true that section 1 of Article XVII has no mineral classification. But this is not conclusive that the Constitutional Fathers interpreted the Enabling Act as not passing mineral; it is not even persuasive when more careful inquiry is made.

In the seventh section of Ordinance I appended to the Constitution we read: ''The state hereby accepts the several grants of land from the United States to the state of Montana * * * upon the terms and conditions therein provided.'' This the court construed in State ex rel. Galen v. District Court, 42 Mont. 105, 112 Pac. 706.

Further, while section 1 of Article XVII of the Constitution does not have a mineral classification, it does provide for classification at a future date. Vision is written here: ''provided, that any of said lands may be re-classified whenever, by reason of increased facilities for irrigation *or otherwise*, they shall be subject to different classification.'' Emphasis supplied.

It is logical to look first at the words of the grant and if the intent is clear and simple consider then the words of acceptance. To look at the words of acceptance,—to see lurking therein the meaning of the grant as reflected in those words—presents no such incongruity as appeared to the trial court.

Our legislature has not interpreted the Enabling Act in such a manner that the Act's restrictions do not apply to mineral on state lands. Compare sections 63 and 67 of Chapter 147 of the 1909 Session Laws. Section 62 of the 1909 Act in part reads: ''If * * * coal oil, gas or other mineral not mentioned herein, be found upon the state land, such land must be leased * * *

*for such length of time* \* \* \* as the State Board of Land Commissioners *may determine."* Emphasis supplied.

Section 63 provides that *"no land* shall be leased for a longer period than *five years".* Emphasis supplied. Section 67 provides: "No State Land shall be leased \* \* \* for a longer period than five years."

It is reasonable to say the legislative intent was such length of time as the board might determine within the five-year limitation.

Administrative construction of the Enabling Act cannot be used as an agreement for unrestricted leasing.

Consider the lease now in litigation. It was entered into March 17, 1925. The original term was five years. At that time the Enabling Act amendment permitted mineral leases for a total period of 20 years. Chapter 108, Laws of 1927, accepted the amendment to the Act. This was before the first five years of the lease period had expired. The terminal date on the 20-year limitation was March 17, 1945. Renewals are permissible only if within the perimeter of the restrictions and we hold that mineral leases come within the restrictions set out in section 11 of the Enabling Act.

We construe the Enabling Act strictly. In State ex rel. Galen v. District Court, supra, 42 Mont. at page 115, 112 Pac. at page 708, this court said: "We are unable to agree with the reasoning of the learned judge. It seems to us that the decision on this point simply amounts to a declaration that the Congress of the United States did not mean what it said when it commanded that sections 16 and 36 in every township should be sold at public sale. Neither can we agree that there is any question of the right of the United States to dictate and restrict the manner in which the state shall dispose of the lands. They all belonged to the United States. A grant to the state, as trustee for its common schools, was in contemplation, and we know of no authority which has the power to question the right of the grantor to make such terms as it saw fit. Neither is there any authority in the state to change the terms of the grant with-

out the consent of the Congress of the United States. * * * The Congress is presumed to have had good and sufficient reason for thus restricting the right of alienation, and *the state solemnly accepted the conditions.* If those restrictive words can be disregarded in favor of the right to exercise eminent domain, then the condition of the grant is not general in its application, as its phraseology would appear to indicate, exceptions may be read into it, and the entering wedge be inserted by which the safeguard may be entirely broken down and removed." Emphasis supplied.

Land not known to be mineral at time of survey and clear listing passed to this state for the common school fund. The language of section 18 did not reserve minerals or mineral rights from these lands to grantee. It was a reservation of known mineral lands. This was protective language to care for discovery between the date of grant and clear listing.

Respondents rely on Neel v. Barker, 27 N. M. 605, 204 Pac. 205, 207, but that decision is in direct conflict with our holding in the Galen case, supra, wherein we said that "A grant to the state, as trustee for its common schools, was in contemplation * * *."

In the case at bar the trial court said: "Bearing in mind that, in my opinion, Congress did not intend to grant to the state any mineral lands, I conclude that the provisions of the Enabling Act with reference to sale and leasing of said lands do not embrace nor include a lease for mineral purposes, and it follows that the state is not controlled nor restricted by said act in regard to leasing said lands for mineral purposes." Categorically stating the intent of Congress, the trial court marches on to its inevitable conclusion doing violence to the spirit and purpose of the very grant itself—the common school fund. The discovery of mineral many years subsequent to the Act of Congress would then rob the land of its trust character. To say the proceeds therefrom would still be subject to trust character for the school funds overlooks the killing power of dilution. The language of the New Mexico case of Neel v. Barker, supra,

points up the danger of the analysis when it approved the lower court's statement that ''it follows that the state is not controlled nor restricted by said act in regard to leasing said lands for mineral purposes.''

But further, in the instant case, the trial court has held that even if the intent by Congress was that section 11 apply to this lease, still it was a five-year lease with earned five-year renewals. With this we cannot agree. As is said in State ex rel. Huckfeldt v. State Board of School Land Com'rs, 20 Wyo. 162, 122 Pac. 94, 97:

''* * * the state cannot at any time enter into a contract leasing any such lands for a period longer than five years.

''* * * It is argued that the statute in question (section 613 [Wyo. Comp. Stat. of 1910]) complies strictly with the above-mentioned limitation expressed in the grant by providing for five-year leases. If, however, it confers upon the lessee, as contended, an absolute right at the expiration of one five-year lease to a renewal thereof * * * and is to be read into every lease controlled by its provisions as a part of the contract, then, notwithstanding that a new lease is required to be executed at the end of each five-year period, the lands covered by such contract of lease would in effect be leased for a period exceeding five years, subject only to the lessee's option to surrender the lands, either by failure to demand a renewal or otherwise, and the provisions for reappraisement and fixing the amount of the future rent.''

To allow circumvention of the restrictions by means of covenant of renewal forever is to violate the general purpose of the trust.

The trial court's conclusion of law No. 54, not being disputed or contested by anyone on this appeal, shall stand, same reading: ''That the stipulation made and entered into herein by and between the plaintiff and the defendants was and continues to be proper and necessary in the protection of the oil and gas estate in said lands and in the preservation thereof for the benefit of the permanent school fund of the State of Montana,

as well as for plaintiff; and such stipulation has operated throughout this litigation to protect and sustain the production of oil and gas without interruption during the litigation in years of terminal or near-terminal production on the lands under lease when continuity of production operations is essential to prevent loss of the declining and diminishing oil and gas supply.''

We hold that the restrictions of section 11 of the Enabling ██ Act apply. The injunction is dissolved, the trial court's findings of fact and conclusions of law in conflict herewith are set aside and vacated, the decree is reversed and the cause remanded to the district court with directions to enter a decree in accordance with this opinion.

MR. CHIEF JUSTICE ADAIR, MR. JUSTICE METCALF, and THE HONORABLE WILLIAM R. TAYLOR, District Judge (sitting in place of MR. JUSTICE FREEBOURN, disqualified), concur.

MR. JUSTICE ANGSTMAN: (dissenting).

I concede the obvious conclusion that the state accepted the grant of sections 16 and 36 as trustee for the common schools and that the state must administer the trust as Congress directed in the grant and that is the sum and substance of the holding in State ex rel. Galen v. District Court, 42 Mont. 105, 112 Pac. 706, so strongly stressed in the majority opinion.

The question before us is what limitations and restrictions, if any, did Congress impose in its grant. Section 11 of the Enabling Act which treats of sections 16 and 36, provides: ''But said lands may * * * be leased for periods of not more than five years * * *''. Section 18 then provides: ''That all mineral lands shall be exempted from the grants made by this act. But if sections sixteen and thirty-six, or any subdivision or portion of any smallest subdivision thereof in any township shall be found by the department of the interior to be mineral lands, said states are hereby authorized and empowered to select, in

legal subdivisions, an equal quantity of other unappropriated lands in said states, in lieu thereof, for the use and benefit of the common schools of said states."

I think Judge Hattersley was right in following the Supreme Court of New Mexico in the case of Neel v. Barker, 27 N. M. 605, 204 Pac. 205, 207, which dealt with similar provisions of the New Mexico Enabling Act. In that case the court approved the language of the lower court as follows:

"It would be utterly inconsistent to say that no mineral lands should be granted to the state, and at the same time that the state in leasing its mineral lands, which it was not to obtain, should follow the formalities prescribed in section 10 of the act. When Congress used the word 'lease' with respect to lands it considered and denominated as nonmineral, it certainly did not have in mind a mineral lease. When the word 'lease' is used with respect to grazing land, a lease for grazing purposes is contemplated; when used in respect to timber lands, a lease for timber purposes is necessarily contemplated; when used regarding agricultural lands, a lease for agricultural purposes is obviously in contemplation, and the same is true with regard to other leases; but when the word is used with respect to lands considered to be non-mineral, certainly a lease for mineral purposes is not in contemplation. The word 'lease,' as used in the Enabling Act, did not contemplate nor include a lease for mineral purposes. * * *

"Bearing in mind that, in my opinion, Congress did not intend to grant to the state any mineral lands, I conclude that the provisions of the Enabling Act with reference to sale and leasing of said lands do not embrace nor include a lease for mineral purposes, and it follows that the state is not controlled nor restricted by said act in regard to leasing said lands for mineral purposes."

There is nothing in the Galen case, supra, that in any manner conflicts with the holding in the Neel case, as stated in the majority opinion, and in fact the Galen case has nothing to do

with the principle of law involved in and passed upon in the Neel case.

I accept the conclusion reached in the majority opinion that the latter part of section 18 of the Enabling Act giving the right to make lieu selections confers a right to be exercised on land known to be mineral at the time of survey and clear listing. I agree too that "lands" in its legal signification includes minerals.

Section 18 of the Enabling Act was enacted in pursuance of the policy and practice of Congress to withhold mineral lands for the use of the United States in the absence of an expressed purpose to include them. United States v. Sweet, 245 U. S. 563, 38 S. Ct. 193, 62 L. Ed. 473. The same policy was reflected in section 11 of the Enabling Act which permitted the exchange of lands for others with the proviso that if any such are exchanged with the United States the exchange shall be limited to surveyed, *non-mineral*, unreserved public lands of the United States.

Lands not known at the time of survey and listing to contain minerals but which actually did contain minerals were nevertheless granted to the state and with it passed the minerals as a part of the land. But it does not follow that a lease of the lands for grazing or agricultural purposes gave any right to explore for, develop or remove the minerals therefrom. Otherwise a lessee ostensibly for grazing or agricultural purposes would have the right to explore for and remove the minerals therefrom at a mere nominal rental. Such results were never contemplated by Congress when it passed the Enabling Act exempting mineral lands from its provisions.

In my opinion when lands contained in the grant by Congress to the states were subsequently found to contain minerals there was no limitation or restriction whatsoever in the Enabling Act affecting the power and right of the state to have the mineral contents of the land developed and removed, except that it still was duty bound to discharge its trust for the common schools. It was however free to choose reasonable means of carrying the

trust into execution. Stearns v. State of Minnesota, 179 U. S. 223, 21 S. Ct. 73, 45 L. Ed. 162.

The legislature of Montana by Chapter 147, Laws of 1909, made provision for the development of the mineral contents of state lands by providing in section LXII thereof that: "If stone, coal, coal oil, gas or other mineral not mentioned herein, be found upon the state land, such land must be leased only for the purpose of obtaining therefrom the stone, coal, coal oil, gas or other mineral, for such length of time, and conditional upon the payment to the register of such royalty upon the product, as the State Board of Land Commissioners may determine." This was a legislative declaration that the board could lease land containing minerals "for the purpose of obtaining therefrom" the minerals "for such length of time" as the board might determine.

It is true that section LXIII of the same Act after speaking of agricultural or grazing lands contains the provision that "no land shall be leased for a longer period than five years". And section LXVII provides that "No State Land shall be leased for any person for a longer period than five years." Those provisions have nothing to do with lands leased for the purpose of obtaining minerals therefrom. As to minerals the special provisions of section LXII control.

This same question under similar statutory provisions was considered in Re Leasing of State Lands, 18 Colo. 359, 32 Pac. 986, 989, and the court disposed of the question by saying: "By the act of 1887 the right to lease for a period of 20 years was taken away, and a 5-year limitation substituted, in cases of farming and grazing lands; the leasing of stone, gas, and mineral lands being provided for by section 8 of the latter act. By the terms of this section it is expressly provided that such lands may be leased 'for such length of time * * * as the commissioners may determine.' At the oral argument it was suggested that the five-year limitation was applicable to the leasing of these lands as well as to the agricultural and grazing lands of the state; the argument being that the discretion as to time given the

board was subject to the five-year limitation. Under the five-year limitation contained in section 10 the board may, at its option, lease for a less period than five years. Hence to construe the words, 'for such length of time * * * as the commissioners may determine,' as meaning for such length of time, not to exceed five years, would be to give no effect whatever to the language of section 8. For the reasons already given, such a construction cannot be indulged. We therefore agree with the attorney general that the five-year limitation does not apply to the leasing of such lands.''

The legislature made separate provision for the disposal of the mineral rights in state lands from the general provisions treating of sales and leases of the land itself. Compare, Toomey v. State Board of Land Com'rs, 106 Mont. 547, 81 Pac. (2d) 407.

Thus by section XXXVII of the 1909 Act it was provided that ''All sales of state lands shall be at public auction only.'' But it is clear that the legislature by this provision was not dealing with the mineral interests for they were treated separately by section LXXI et seq. of Chapter 147, and section 11 of the Enabling Act provides: ''That all lands granted by this act shall be disposed of only at public sale after advertising.'' If the majority opinion herein is sound then carried to its logical conclusion there can be no disposal of the minerals in state school lands except at public sale and as a part of the sale of the land itself. I think the Enabling Act is not open to such an interpretation.

Chapter 147, Laws of 1909, was the only Montana statute in force when the lease in question here was executed. By its terms the lease gives the lessee the privilege and option of renewal upon the same terms and conditions as to rentals and royalties as contained in the original lease, upon the lessees' discharging certain enumerated obligations, all of which were performed by plaintiff. Also by its terms the state reserved the right to sell or lease the land subject to the rights of the lessee under the terms of its lease. It is clear that the lease was made in conformity with Chapter 147, Laws of 1909, then in effect.

True, Congress by Act of August 11, 1921, 42 Stat. 158, proposed an amendment to the Enabling Act, sec. 11, providing in part: "And provided further, That any of such granted lands found, after title thereto has vested in the State, to be mineral in character, may be leased for a period not longer than twenty years upon such terms and conditions as the legislature may prescribe." This amendment was not consented to by the state of Montana until in 1927. The lease in question here was made in 1925.

The rule is that: "A grant by congress of land to a state 'for the use of schools' is an absolute grant, vesting title for a specific purpose, and not a grant as on a condition subsequent. The grant and its acceptance by the state constitute a solemn compact between the state and the United States * * * and the grant cannot be withdrawn after its acceptance by the state, nor can the terms of the grant be changed except with the consent of the state." 50 C. J., Public Lands, sec. 162, p. 963.

The approval of the 1921 amendment in 1927 could not affect the lease in question for that would be an impairment of the obligations of a contract contrary to the United States Constitution. That the legislature in 1927 did not intend to have the Act affect existing leases is shown by the fact that it expressly provided that: "All existing oil and gas leases heretofore executed by the Register of State Lands on behalf of the State of Montana are hereby ratified, confirmed, and approved, provided, that the holder of any such lease shall, within ninety (90) days from the date this Act goes into effect, file in the office of the Register of State Lands consent in writing to the amendment of such lease to contain a reservation to the State of the right at all times to take and receive its royalties in money or kind * * *." Chapter 108, Laws of 1927, sec. 8.

Plaintiff here filed this consent in writing within the time provided for. But it is claimed that by section 13 of this Chapter the Act was made retroactive as of 1921 when the Congressional Act was passed.

Section 13 provides in part: "The State of Montana, for the

purpose of enabling it to take advantage of the powers to it granted by the United States, mentioned in an Act (describing it by title) approved August 11th, 1921, hereby accepts said powers as of said date of approval of said Amendatory Act.''

This section does not affect the plain provisions of section 8 above quoted. Its retroactive effect is limited to the powers conferred upon the state and does not apply to obligations under outstanding leases affecting rights of third parties, which are specially treated, ratified and confirmed in section 8.

In my opinion Judge Hattersley was right in holding that plaintiff had the right to have its lease renewed.

Chapter 107, Laws of 1909, in effect as the controlling law when the lease was made, clearly authorized such a lease.

It is noteworthy that Congress by an Act of April 13, 1948, 62 Stat. 170, has provided that: ''Leases for the production of minerals, including leases for exploration for oil, gas, and other hydrocarbons and the extraction thereof, shall be for such term of years and on such conditions as may be from time to time provided by the legislatures of the respective States''. Experience apparently has demonstrated to Congress that the legislatures of the respective states can be entrusted with the responsibility of carrying out their trust with respect to the production of minerals on school lands.

I think the judgment should be affirmed.